413 So.2d 627 (1982)
Michael M. TIMMERMAN
v.
C. Derbes SMITH and C. Derbes Smith, Inc.
No. 14683.
Court of Appeal of Louisiana, First Circuit.
April 13, 1982.
Robert P. Chatelain, Metairie, for plaintiff, appellant.
Frederick Heisler, New Orleans, for defendants, appellees.
Before COVINGTON, COLE and WATKINS, JJ.
COLE, Judge.
The principal issue presented here is whether or not plaintiff, who signed a purchase agreement for a certain piece of real estate, breached that agreement and is therefore required to pay the real estate commission to the listing agent.
The facts as presented at trial are as follows. Plaintiff, Michael M. Timmerman, agreed to purchase from the nominal owner, *628 Robert T. Smith,[1] a certain tract of land consisting of 5.05 acres. The land was listed with C. Derbes Smith, Inc. Smith signed the purchase agreement (offering to sell) on January 10, 1979, and Timmerman's agent (accepting the offer in his behalf) signed the purchase agreement on January 12, 1979. Timmerman agreed to pay $325,000 for the property, subject to his ability to borrow $200,000. The act of sale was to be passed no later than April 1, 1979. The seller was to pay a 10% real estate commission, which was to be split, 5% to C. Derbes Smith, Inc., and 5% to Investors Swayze, McLaughry Realtors (I.S.M.).[2]
Pursuant to the agreement, Timmerman's agent, Jean Van Brunt of I.S.M., gave Mrs. Smith (C. Derbes or Cynthia Derbes Smith of C. Derbes Smith, Inc.) a check for $10,000 and a promissory note for $15,000 which served as a deposit for the property in question. The check was deposited in the escrow account of C. Derbes Smith, Inc.
As the time for executing the sale drew near, Mr. Timmerman had been unable to secure financing from a lending institution. According to Mr. Smith he was asked by Mrs. Smith if he thought his firm, Slidell Associates, would "take any of the paper on it or do some of the financing." Smith testified: "And I said I thought that we would. We certainly would like to discuss it with them, with Mr. Timmerman, if his group were having problems. I don't recall whether I talked to Miss Van Brunt about it personally or not."[3] In response to a specific question, Mr. Smith asserted that he, as general partner of Slidell Associates, agreed to provide financing if Mr. Timmerman could not get it from another source. No precise time frame was elicited as regards the conversation or the commitment. On March 2, 1979, Mrs. Smith wrote a letter to Mrs. Van Brunt concerning the purchase agreement and in which she stated:
"This is to confirm our conversation of yesterday (2/28/79) and your conversation with Bob Smith Monday (2/26/79), stating the above mentioned contract is still valid. The Purchasers have financing or the Sellers have agreed to hold a first mortgage if necessary."
Thereafter, by letter dated March 23rd, Mrs. Elaine Guillot, attorney and notary for Mr. Smith, notified Timmerman the purchase agreement expired on April 1st and since that date was a Sunday, the sale would have to close by Friday, March 30th. She advised him that unless he made other arrangements prior to March 30th, Slidell Associates (the titular owner) would be ready to pass title to him at 5 P.M. on that date, the sale to take place in her office.
At the appointed time the parties met in Mrs. Guillot's office. According to Mrs. Smith she remained in her nearby office waiting to be called when all documents were ready. Mrs. Guillot had prepared for the occasion an act of cash sale, a document entitled "Tender of Title"[4] which contemplated the nonappearance of Mr. Timmerman, and an "Extention Agreement," the latter purporting to extend the time for closing the sale until April 6, 1979. None of the documents were ever signed and, noticeably, no mortgage or other loan document had been prepared for execution in conjunction with the proposed transaction. After some delay the parties confected several *629 other purchase agreements whereby Timmerman was to acquire certain properties and then exchange these properties for the 5.05 acres. The new purchase agreement which pertained specifically to the 5.05 acres recited the previously agreed upon consideration, to-wit, $325,000, and provided for the same real estate commission to be paid to the same parties. This proposed transfer of the 5.05 acres was made contingent upon the acquisition of the other properties by Timmerman and further provided: "This agreement supersedes contract dated January 10, 1979."
On April 26, 1979, the parties met and executed the act of exchange. Mrs. Smith had submitted a statement showing a commission due C. Derbes Smith, Inc. in the amount of $16,250. The statement noted a credit for the $10,000 deposit which the firm had previously received and indicated a balance due of $6,250. At the time, Mr. Timmerman expressed his concern about the return of his $10,000 deposit, obviously not conceding that he owed the commission. Mr. Smith acknowledged it was the seller's obligation to pay the commission. He had previously sought to furnish a promissory note for the commission as evidenced by a message Mrs. Smith sent him on April 25th in which she stated her attorney had advised her not to accept a note. Notwithstanding her position, Mr. Smith provided the closing attorney with a promissory note payable to C. Derbes Smith, Inc. for $16,250, signed by him for Slidell Associates. In addition, Mr. Smith, in a sworn statement, declared he had paid by virtue of the note all commissions due C. Derbes Smith, Inc. arising from the act of exchange.
Following the act of exchange a demand was made upon Mrs. Smith for the return of the $10,000 deposit. Through counsel, she advised the $10,000 in her escrow account was to be used in partial satisfaction of the commission. Counsel then stated: "If it was the intention of the parties that the purchasers were not to put up any cash money in this transaction, then it should be the responsibility of the sellers to provide for payment of the real estate commission in cash."
On June 8, 1979, Mrs. Smith caused to be transferred out of the escrow account and into her firm's general account the $10,000 deposit. She testified this action was taken by her both as president of her corporation and individually as the qualifying broker for the firm. Mrs. Smith acknowledged the funds were used ultimately as operating expenses, including payments to her for her salary and other remuneration. None of the funds, she testified, had been paid to Mr. Smith.
Failing in his efforts to recover his deposit, Timmerman filed this lawsuit against C. Derbes Smith and C. Derbes Smith, Inc. He seeks the return of his deposit and as a security measure obtained a writ of sequestration pursuant to which the trust account of C. Derbes Smith, Inc. was seized to the extent of $10,000. Defendants answered and a reconventional demand was asserted by C. Derbes Smith, Inc. in which it was alleged Timmerman breached the buy-sell agreement of January 10, 1979, and was therefore obligated to pay the commission. Plaintiff-in-Reconvention thus sought judgment against Timmerman for $6,250 claimed to be still owed on the commission. Mrs. Smith filed a motion for summary judgment contending she had no personal liability. An extract of the minute entry pertaining to a hearing on the motion shows that same was denied. The individual liability of Mrs. Smith was one of the issues contested at trial.
In written reasons for judgment the trial court stated:
"It is the conclusion of the Court that the January 10, 1979, contract was a viable agreement between Timmerman and Smith, and that title was tendered by Smith to Timmerman. This conclusion rests on the foundation provided by the March 23, 1979, letter from Attorney Guillot instructing the parties to appear in her offices on March 30, 1979, for passage of the act of sale, and further, by the fact that the parties did appear at her offices at the appointed time.

*630 "Further, the evidence clearly establishes that on March 30, 1979, the purchaser and seller agreed to rescind or set aside the January 10, 1979, agreement to purchase and sell, and substitute in its place an agreement to exchange properties."
Stating the law to be that an agent is entitled to collect his commission from the purchaser under a buy-sell agreement in the event the purchaser breaches the agreement or agrees with the seller to rescind the contract, the court announced its intention to render judgment in favor of C. Derbes Smith, Inc.[5] and against Timmerman in the sum of $6,250, plus attorney fees in the sum of $3,000. Additionally, the court reasoned the writ of sequestration would be recalled, vacated and set aside as a consequence of plaintiff's petition being dismissed.[6]
Because we disagree with the conclusion of the trial court that the January 10, 1979 contract was a viable agreement between Timmerman and Smith, the breach of which, or agreement to rescind, giving rise to liability on the part of the buyer for payment of a commission, we reverse. In so doing we find it unnecessary to address the validity of the stated rule of law, as applied to the facts of this particular case. Further, we pretermit a consideration of the correctness of the trial court's factual determinations that on March 30th Smith tendered title to Timmerman, Timmerman breached the agreement, and it was the intent of the parties to "rescind or set aside" the agreement.
Of determinative value are the following provisions of the purchase agreement:
"This sale is conditioned upon the ability of purchaser to borrow upon this property as security the sum of $200,000.00 by a mortgage loan or loans at a rate of interest not to exceed 12% per annum, interest and principal payable in equal monthly installments over a period of not less than 20 years. Purchaser obligates self to make good faith application for required loan(s) immediately but in no event later than 10 days of date of acceptance of offer."
"Should purchaser, seller or agent be unable to obtain the loan stipulated above within 45 days from acceptance hereof, this contract shall then be null and void and the agent is hereby authorized to return the purchaser's deposit in full. Commitment by lender to make loan, subject to approval of title, shall constitute obtaining of loan." (Emphasis supplied by the court.)
"If this offer is accepted, seller agrees to pay the agent's commission of 10% of gross sales price which commission is earned by agent when this agreement is signed by both parties and when the mortgage loan, if any, has been secured." (Emphasis supplied by the court.)
"Either party hereto who fails, for any reason whatsoever, to comply with the terms of this offer, if accepted, is obligated and agrees to pay the agent's commission and all reasonable attorney's fees and costs incurred by the other party, and/or agent in enforcing their respective rights."
It is well settled that an agreement to purchase an immovable, conditioned upon purchaser's ability to obtain a stipulated loan to finance the purchase, is a contract subject to a suspensive condition. If the purchaser, through no fault of his own, is unable to obtain the loan, he is released and entitled to the return of his deposit. Conversely, if the purchaser fails to complete the agreement due to his lack of good faith and seeking the stipulated financing, the real estate broker is entitled to recover his commission from him. Dapremont v. Crossley, 367 So.2d 127 (La.App. 4th Cir. 1979), writ denied 369 So.2d 710 *631 (La.1979); Wells v. Spears, 255 So.2d 215 (La.App. 1st Cir. 1971); Landry & Passman Realty, Inc. v. Keen, 170 So.2d 775 (La.App. 1st Cir. 1964); Treadaway v. Piazza, 156 So.2d 328 (La.App. 4th Cir. 1963).
The agreement at issue was confected as of January 12, 1979, the day Mrs. Van Brunt, acting for Timmerman, accepted Smith's offer. Timmerman had forty-five days from January 12th within which to obtain the stipulated financing. This period of time expired on February 26th. A careful study of the evidence clearly demonstrates Timmerman, aided by Mrs. Van Brunt, made a good faith effort to obtain the financing. Timmerman testified: "The terms of the agreement had not been reached because in forty-five days financing had not been secured. I continued to look for financing on the property, which was not available." As regards his appearance in the notary's office on March 30th, Timmerman explained:
"I went there, the occasion was the act of sale. I went there to the act of sale that was set for the piece of property. The financing contingency had not been met. I didn't expect to take title to that piece of property that day for that reason. I went there and Mr. Smith and myself negotiated an exchange which took the place of that agreement. No one was ever put into default."[7]
In further explanation of his situation on March 30th, Timmerman, when asked if it was true he was not prepared to take title on that day, responded: "That is correct. I didn't have the loan." The court's appreciation of Timmerman's testimony at that point in the trial was:
"I think the witness has pretty well gone into the factual basis that surrounded his going to Ms. Guillot's office that day. As I understood it, that was the day the act of sale was set for, he went there although at the time he went he did not think in his own mind that the act of sale would be passed because there was still outstanding the financing contingency and it was at that act of sale or at Ms. Guillot's office, not necessarily at the act of sale that the subsequent agreements were negotiated. I think that is what he said and I don't think if we stay here all day he is going to veer far away from that."
Following which Timmerman stated: "That is correct."
No one questioned Timmerman's assertion that although forty-five days had elapsed he continued to seek financing. And, there is no contradictory evidence in the record. There is, however, evidence corroborative of his efforts to obtain a loan. Mrs. Van Brunt was questioned as to her actions following her receipt of Mrs. Smith's letter of March 2nd which made reference to the seller's agreeing to hold a first mortgage, if necessary.
"Q. Didn't you assume that the financing referred to in the letter would be on the same terms as the financing set out in the purchase agreement, P-1?
A. I don't remember, I don't know Mr. Timmerman was attempting to get financing at other institutions...."
At another point in her testimony, Mrs. Van Brunt stated:
"I had at the time that I was attempting to help Mr. Timmerman acquire the financing I had gone to the lending institutions there in Slidell and had taken financial statements to the particular lending institutions. At that particular point I did not know if Mr. Timmerman had acquired financing in New Orleans or if there was financing, and I don't know why I didn't call her and call Mr. Smith or Mrs. Smith to determine the rate or the amount of financing."
From the above, there is no reason to doubt the purchaser in this case made a good faith effort to obtain a loan, both before and after the forty-five day period had expired.
*632 It is the contention of appellees that the seller's offer to provide financing fulfilled the contingency in the purchase agreement and the purchaser's failure to take title to the property obligated him to pay the real estate commission. However, unless this offer was communicated to the purchaser within the forty-five day period it was to no avail. The explicit terms of the agreement rendered it null and void at the end of February 26th, 1979, and an offer thereafter to finance could not breathe life back into the document. We find nothing in the record to establish the offer was even made prior to the expiration of forty-five days, i.e., prior to midnight, February 26th. At most, there may have been a conversation between Mr. Smith and Mrs. Van Brunt on February 26th. Mrs. Van Brunt could not recall such a conversation and Mr. Smith was uncertain as to whether or not he talked to Mrs. Van Brunt personally. Even assuming a conversation took place in which an offer to finance was made, there is no evidentiary intimation the offer was made on the same terms and conditions stipulated in the purchase agreement. To be effective the offer would have to be on the same terms and conditions and communicated to Timmerman before February 27th. Certainly, the letter of Mrs. Smith dated March 2nd, which referred to a conversation between Van Brunt and Mr. Smith on February 26th, is no proof of an offer to finance on the same terms and conditions as specified in the purchase agreement. It is not even proof the conversation took place. And, assuming the requisite offer was made on February 26th, there is no contention it was communicated to Timmerman the same day. To the contrary, it is clear from the evidence Timmerman was not contacted until after the letter of March 2nd relative to the seller's offer to hold a first mortgage on the property. Mrs. Van Brunt testified:
"When I received that letter I called Mr. Timmerman and told him the letter I read the letter to him and told him that the letter was there. Mr. Timmerman was to make his assumptions about the financing or how he was to be able to accept it."
In the case of Burdon v. Harvey, 385 So.2d 514 (La.App. 4th Cir. 1980), the court was called upon to interpret the identical contractual provisions we now have before us.[8] The facts of that case are strikingly similar to those of this case. In Burdon, the court held that by continuing their efforts to obtain a loan after the stipulated forty-five days expired, the purchasers did not waive the suspensive condition which provided the contract would become null and void. It also held any offer by the sellers to finance within the forty-five day period was not binding upon the purchasers unless it was under the terms and conditions of the agreement. Still further, the court held that even where the sellers offered to finance within forty-five days under the terms and conditions listed in the agreement, to bind the purchasers the offer had to be communicated to them within the forty-five day period. Finding that this was not done the Burdon court ordered the return of the purchasers' deposit. We find Burdon to be dispositive of the issues before us. The purchase agreement between Smith and Timmerman was no longer in effect after February 26, 1979. Accordingly, it cannot serve as the basis for the award of a broker's commission.[9]
There is no contention by appellees that a commission is due from appellant by virtue of the subsequent agreement of March 30, 1979. We recognize appellee, C. Derbes Smith, is a third party beneficiary of that contract. La.Civ.Code art. 1902. However, no action has been brought against Mr. *633 Smith pursuant to that contract and we therefore cannot address any liability he may have flowing from the agreement. As to Timmerman, it is obvious its terms preclude any liability for a commission.
The secondary issue of whether or not Mrs. Smith should be held personally liable in this case must be resolved against her. In addition to the liability of the corporate entity, C. Derbes Smith, Inc., which received and disbursed the $10,000 deposit, Mrs. Smith is liable because of her breach of the fiduciary duty she owed Timmerman. This fiduciary duty arises from her licensed position as a real estate broker and was breached by her act of transferring his deposit from the escrow account and using it for general operating expenses, including her salary.
In Burdon v. Harvey, supra, it was stated at page 517:
"The Civil Code states that a broker is an agent for both parties, having a duty towards both, and is answerable for his fraud or fault. LSA-C.C. arts. 3016, 3017, 3018;3 Uhlich v. Medallion Realty, Inc., 334 So.2d 788 (La.App. 4th Cir. 1976), writ denied 338 So.2d 701 [(La. 1976)]. On the other hand, there is some disagreement whether a real estate broker is truly within the purview of the mandate articles of the Civil Code. See Leggio v. Realty Mart, Inc., 303 So.2d 920 (La.App. 1st Cir. 1974), writ refused, 307 So.2d 629 [(La.1975)]; Fleming v. Romero, 342 So.2d 881 (La.App. 3d Cir. 1977), writ refused 345 So.2d 50 [(La.1977)]; Yiannopoulos, `Brokerage, Mandate, and Agency in Louisiana: Civilian Tradition and Modern Practice,' 19 La.L.R. 777 (1959) which suggests brokerage is a sui generis contract which may or may not coincide with the agency and mandate articles. The line of cases following that idea states that `the real estate broker's duties are limited to those which can be analogically drawn from LSA-R.S. 37:1354 and from the customs and practices of real estate brokers in general.'4 Fleming v. Romero, supra, at 884; see also, Leggio v. Realty Mart, Inc., supra, and Amato v. Latter and Blum, Inc., 227 La. 537, 79 So.2d 873 (1955)."
See also, Gallioto v. Trapani, 238 La. 625, 116 So.2d 273 (1959), wherein, at p. 275, it was stated:
"It is manifest from the very nature of the transaction entered into in this instance that the realtor was acting in the capacity of a broker to bring the prospective purchaser and owner together and thus became their joint agent. Acting in the dual capacity the realtor was bound and obligated to treat them with equal fairness, fidelity and trust."
In the instant matter it is immaterial whether we use the codal articles as the foundation for the fiduciary duty owed by Mrs. Smith or whether we invoke the duties imposed upon her by the Louisiana Real Estate License Law (La.R.S. 37:1431 et seq.) as a basis for the duty. The result would be the same.
La.R.S. 37:1455 sets forth the causes for suspension of a real estate broker's license. Among these is the failure of the broker to maintain and deposit in a separate account all money received as an escrow agent in a real estate transaction unless all parties having an interest in the funds have agreed otherwise in writing; and, the violation of any rule or regulation promulgated by the commission in the interest of the public. Among the rules adopted by the Louisiana Real Estate Commission is § 15.8 of 11-15:15 dealing with escrow accounts. It provides:
"Monies received and deposited in escrow (trust) accounts or rental trust accounts shall be transferred to the personal account of the broker only upon being earned and with the consent of the owner of the funds, or by court order."
It is also noted a real estate broker's license cannot be granted to a corporation unless the corporation designates only one qualifying broker who owns a substantial interest in the corporation and who shall represent *634 the corporation. See Rule 11-15:28. It is clear the intent of the law is to impose upon an individual, not a corporation, the public trust inherent in the position of real estate broker.
The fairly recent case of Avegno v. Byrd, 377 So.2d 268 (La.1979), is ample authority for imposing personal liability in this matter. In Avegno, our Supreme Court held (p. 273): "Where the rules governing the profession create a duty in favor of the public, a breach of that duty to the damage of a member of the public, within the class sought to be protected by the rule, is actionable under Article 2315 of the Civil Code just as is any other act that causes damage to another."
Accordingly, the judgment of the district court is reversed and it is hereby ordered, adjudged and decreed that there be judgment in favor of Michael M. Timmerman, and against C. Derbes Smith, individually, and C. Derbes Smith, Inc., in solido, for the sum of $10,000, plus legal interest thereon from date of judicial demand, until paid, and for all costs of court incurred at both the trial and appellate levels.
It is further ordered, adjudged and decreed that the writ of sequestration previously issued herein be maintained; and that the reconventional demand of C. Derbes Smith, Inc. be dismissed.[10]
REVERSED AND RENDERED.
NOTES
[1] Robert T. Smith is the general partner of Slidell Associates and of PDRS Properties, partnerships in commendam; and, was at one time married to Cynthia Derbes Smith. On January 10, 1979, Slidell Associates was the actual owner of the 5.05 acres. On April 26, 1979, Slidell Associates conveyed the property to PDRS Properties which, in turn, conveyed title to plaintiff pursuant to an Act of Exchange.
[2] Robert T. Smith is also a licensed real estate agent and was at times pertinent hereto under contract with "Cynthia Derbes Smith d/b/a C. Derbes Smith, Inc." as an "Associate" and was admittedly entitled to at least 30% of the commission for having listed the property with C. Derbes Smith, Inc.
[3] Mrs. Van Brunt testified she did not remember a conversation with Mr. Smith or Mrs. Smith concerning financing although she admitted such conversations could have taken place.
[4] Mrs. Smith testified she made a phone call to Mrs. Guillot asking her to prepare a tender of title.
[5] The judgment signed by the court, perhaps inadvertently, decreed the award to be in favor of "plaintiff in reconvention, C. Derbes Smith." Plaintiff-in-Reconvention was, of course, the corporate entity, not Mrs. Smith individually.
[6] The court noted Mrs. Smith had violated the real estate commission rules by transferring the deposit from the escrow account to her operating account but that this violation had no bearing on the buyer's responsibility to pay the commission.
[7] On balance, the evidence in this case establishes the fact that an act of exchange had been discussed by the parties previous to the meeting of March 30th.
[8] For another case in which the identical contract clauses were presented to the court, see Williams v. Bel, 339 So.2d 748 (La.1976). Interestingly, a commission was denied therein even though the suspensive condition was met, the court holding it was not the common intent of the parties that a commission be paid where unusual circumstances later developed.
[9] Nor could it serve as the basis for a novation, as contended by appellant. There was no existing obligation on March 30th, 1979. The parties could not, therefore, agree to extinguish it and substitute a new one in its place. La.Civ. Code art. 2185.
[10] We deny appellant any entitlement to attorney fees. The purchase agreement does not provide for attorney fees in this instance. Also, see Lanusse v. Gerrets, 357 So.2d 45 (La.App. 4th Cir. 1978).